Alexander C. STANOJEV,
Plaintiff-Appellee,

v.

EBASCO SERVICES, INCORPORATED,
Defendant-Appellant,

and

John Scarola, Richard Albosta and
William Wallace, III, Defendants.

No. 161, Docket 80–7476.

United States Court of Appeals,
Second Circuit.

Argued Oct. 6, 1980.

Decided March 4, 1981.

Louis H. Willenken, New York City (Reid & Priest, John M. Nonna, Deborah A. Pitts, New York City, of counsel), for defendant-appellant.

Nancy Packes, New York City, for plaintiff-appellee.

Before FEINBERG, Chief Judge, VAN GRAAFEILAND, Circuit Judge, and BLUMENFELD, District Judge.*

* Honorable M. Joseph Blumenfeld, Senior United States District Judge for the District of Connecticut, sitting by designation.

BLUMENFELD, District Judge:

In October 1978 Alexander Stanojev was discharged by Ebasco Services, Inc. from his position as Vice President for Special Assignments. He brought suit under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–34 (1976 & Supp. II), claiming that he had been fired because of his age. After trial before Judge Brieant in the Southern District of New York, a jury returned a verdict for the plaintiff awarding $800,000 damages. The court ordered a remittitur of damages in excess of $250,000 which Stanojev accepted in lieu of a new trial. Ebasco brings this appeal claiming error in the jury instructions, insufficient evidence to support the verdict, and passion and prejudice on the part of the jury. Ebasco also contests the measure of damages applied by the judge. We reverse and remand.

### I. The Facts

When plaintiff Stanojev was 51 years old in 1966 he was employed as a vice president of an engineering firm in Michigan which provided engineering and consulting services to companies operating power plants to generate electricity. His work history included some earlier experience in the field of building construction. Because of his family's unhappiness, attributed to living in the Midwest, Stanojev responded favorably to enquiries from New York-based Ebasco Services, Inc. Ebasco was engaged not only in providing engineering and consulting services, but also in the actual construction of electricity-generating power plants fueled by nuclear energy. After a few meetings, spaced over several weeks, Stanojev agreed to go to work for Ebasco. There was no written contract of employment, and this was an ordinary case of employment at will. Although Stanojev became a part of management at a high executive level, he did not move into any defined position. As he testified, "I just didn't have

one special job to do." He was given the title of "utility consultant."

When he was thus injected into the management cadre so haphazardly it was thought by the company that qualifications suggested by Stanojev's experience would enable him to fit into the company's program to get new customers and contracts to construct nuclear power plants. It didn't work out that way.

## A. Stanojev's Job History at Ebasco

In the mid-1970's, the market for nuclear power plants began to decline. Competition among construction engineering and consulting firms such as Ebasco consequently intensified. This situation required the development of a more aggressive marketing strategy merely to maintain market share. Stanojev was at this time Vice President of Business Development, Ebasco's marketing department. In 1974 Ebasco's market share began to diminish, and the company brought in a Mr. Liberatore as Senior Vice President of Business Development, over Mr. Stanojev. In 1976 Mr. Liberatore removed Stanojev from Business Development because of dissatisfaction with his performance and management capabilities. Stanojev makes no claim of any impropriety with respect to this removal. For approximately one year after his removal from Business Development, Stanojev held the title of Vice President for

Nuclear Standardization. This job had not previously existed. He prepared his own description of the position. No one reported to Stanojev in the Nuclear Standardization position, whereas between 10 and 120 employees had been responsible to him in Business Development. Nuclear Standardization was essentially a project rather than a structural position within the Ebasco organization. At the end of 1977 Ebasco's new chief executive made Stanojev Vice President for Special Assignments. After Stanojev was transferred, the Nuclear Standardization work was done by a 65-year-old vice president; Stanojev was then about 61. The new position also did not exist before or after Stanojev held it, and, as the title implies, consisted of a number of special projects.[1] Ebasco's top management continued to be dissatisfied with Stanojev's performance in the new position.

Mr. Scarola, the new chief executive, had emphasized a policy of identifying marginal performers among Ebasco employees to find an area in which the employee could make a contribution, or, if he could not, to discharge the employee. Stanojev did not perform up to the company's expectations in his post-Business Development positions. On October 3, 1978, Mr. Scarola told Stanojev that he was discharged effective October 31, 1978. He was given six months' severance pay.[2] He was not replaced. His position was discontinued.

1. The projects that Stanojev worked on as Vice President of Special Assignments were: the relationship between quality assurance and quality control programs in the construction of a particular nuclear power plant; a planning report referred to as "N–Stamp"; and the determination of space allocation in Ebasco's new headquarters. All these projects were of a temporary, short-term nature.

2. On October 18, 1978, Stanojev was presented with a letter, containing a space for his signature, to "confirm the following agreement between you and Ebasco." The letter covered termination arrangements and included provision for six months' pay following his termination as vice president at the end of October. It also proposed to continue his insurance and other benefits during a "leave of absence," which would continue

until the earliest of the following events: (a) December 31, 1980, (b) commencement of early retirement from Ebasco, should you so elect, or (c) the date on which you first become associated with or employed by a company or other entity which is a competitor of Ebasco in the rendering of engineering, design, consulting or construction services for electric power plants.

Stanojev refused to accept these arrangements. He nevertheless received six months' severance pay and was invited to continue to use his office until he relocated. At no time, however, was there any indication that there was a written employment contract or any other fact which would demonstrate that Stanojev's was anything other than an employment at will. As a matter of contract law he could have been fired at any time for no reason at all, or any reason other than the fact that he was over 40 years old.

Stanojev's belief was that he had become a scapegoat for Ebasco's decline which was precipitated by the fall in demand for nuclear power plants in the mid-1970's. Although he does not complain of any improper motive in his job transfers between 1974 and 1978, he contends that in 1978 Ebasco attempted to force him into early retirement not because of poor performance on his part, but because of his age. Stanojev was 63 in 1978. He contended that Ebasco was motivated to seek his retirement by the impending effective date of an amendment to the ADEA that extended its protection to age 70.

B. *Ebasco's Dissatisfaction with Stanojev*

The testimony of Stanojev's superiors told a different story. Stanojev was removed from Business Development because of dissatisfaction with his performance. The men to whom he reported while in that position testified that Stanojev was deficient in administration, in implementing recommended changes, and in recruiting and training new sales personnel. They felt that Stanojev had resisted needed changes at a time when innovation and imagination were especially important to the company.

Stanojev was therefore removed from Business Development and put into Nuclear Standardization, where his technical expertise would be useful, but his deficiencies as an executive would not affect the company's performance. But Stanojev's performance continued to be inadequate. Mr. Scarola, Stanojev's superior in Nuclear Standardization, testified that Stanojev required too much direction.

Stanojev's performance did not improve when he was transferred to his final position, in early 1978, as Vice President for Special Assignments. Mr. Wallace, to whom Stanojev reported in this last position, testified that Stanojev required too much direction, was too slow in completing projects, and did not offer sufficiently specific suggestions with respect to the problems he considered. Stanojev admitted that he had received criticism from Mr.

Wallace, and that they may have had a personality conflict. Mr. Scarola, the chief executive, who had discussions with Mr. Wallace about Stanojev's performance during this period, concurred in the judgment that Stanojev required too much direction in comparison to what was expected of an employee at the executive officer level.

In short, Stanojev had performed well at Ebasco through 1973. From 1974 until his discharge in 1978, however, Stanojev's superiors were dissatisfied with Stanojev's performance as an officer. After removing Stanojev from Business Development in 1976, Ebasco's top management tried him in two further positions. But although Stanojev successfully completed the three projects he undertook in Special Assignments, he was not performing at the level that was expected of Ebasco officers at a time when the chief executive was emphasizing the corporate policy of removing marginal performers if it was found that they could not make a useful contribution in some other area.

The dissatisfaction with Stanojev to which Ebasco's officers testified is borne out by the record of Ebasco's concrete actions toward Stanojev. Ebasco was pleased with his performance and gave him merit raises each year through 1973. Stanojev received no raises during his last three years in Business Development. He did not receive a raise during the year he was in Nuclear Standardization, and he received only a "token" bonus, lower than any other officer's. Scarola's notation on the document which recommended bonuses said of Stanojev, "token award, rate as B group." At trial Scarola explained that "B group" referred to employees below the officer level. In 1978, while Stanojev was in Special Assignments, he was recommended for a "cost of living" increase, again the lowest of Ebasco's officers' raises that year.

Stanojev's case, apart from his theory that Ebasco was motivated by the impending change in the ADEA, was based entirely on *two* alleged irregularities in Ebasco's recordkeeping procedures. First, Stanojev introduced a section of Ebasco's personnel

manual which stated that discharges were to be preceded by two oral warnings which must be confirmed in writing and filed in the employee's personnel file. No such filings were made in Stanojev's case. There was no evidence, however, that this procedure had ever been applied to employees at the executive level. Second, Ebasco was unable to produce documents giving written evaluations of Stanojev's performance. The Management Succession Charts, which contained evaluative information on employees still at Ebasco, had been discarded when the company moved to the World Trade Center in 1979. Stanojev argues that these alleged irregularities permit inferences that his discharge was motivated by his age. Since Stanojev offers no other evidence of discrimination, his case depends on whether inferences from these irregularities are sufficient to establish a case of age discrimination.

## II. *The Law*

■ Mr. Stanojev's claim against Ebasco is brought under the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621–34 (1976 & Supp. II). The ADEA prohibits an employer from discharging an employee because of his age, 29 U.S.C. § 623(a) (1976), but permits an employer to discharge an employee based on reasonable factors other than age, *id.*, § 623(f)(1), or for good cause, *id.*, § 623(f)(3) (Supp. II). The plaintiff has the initial burden of offering evidence "adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977) (construing Title VII, 42 U.S.C. § 2000e *et seq.*).[3] In the absence of direct

evidence that age was a factor in the decision to discharge the plaintiff, he undertook to present a prima facie case based upon the general circumstances under which he was discharged. A set of circumstances which would justify an inference of illegal discrimination was enunciated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

### A. *The McDonnell Douglas Criteria*

In *McDonnell Douglas* the Supreme Court set forth the order and allocation of proof in a Title VII disparate treatment employment discrimination case in the hiring context. *Id.* at 800–806, 93 S.Ct. at 1823–1826. The Court said that the plaintiff would make a prima facie case if he could demonstrate that the following set of facts was present:

1) he belonged to a racial minority;

2) he applied and was qualified for a job for which the employer was seeking applicants;

3) despite his qualifications he was rejected;

4) after his rejection the position remained open and the employer continued to seek applicants of the plaintiff's qualifications.

*Id.* at 802, 93 S.Ct. at 1824. The Supreme Court has since explained that these facts permit an inference of discrimination because by proving them, a plaintiff shows that he was not rejected for either of the "two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought." *International Brotherhood of Teamsters v. United States*, 431

---

**3.** As the Supreme Court pointed out in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335–36 n.15, 97 S.Ct. 1843, 1814 n.15, 52 L.Ed.2d 396 (1977), discriminatory or disparate treatment in violation of Title VII occurs where "[t]he employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." "Disparate

impact," on the other hand, results from the use of "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Id.*, 431 U.S. at 336 n.15, 97 S.Ct. at 1814 n.15. Proof of motive is not required to sustain a claim of disparate impact.

*Geller v. Markham*, 635 F.2d 1027, 1031 (2d Cir. 1980).

U.S. at 358 n. 44, 97 S.Ct. 1866. *See Furnco Construction Corp. v. Waters,* 438 U.S. 567, at 577, 98 S.Ct. 2943, at 2949, 57 L.Ed. 957. Applying this mode of proof to the case of an employee who is discharged we have recognized that to justify an inference of discrimination the plaintiff must prove that he "possesses the basic skills necessary for the performance of [the] job," *Powell v. Syracuse University,* 580 F.2d 1150, 1155 (2d Cir.), *cert. denied,* 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978), and that the job was filled by someone else. *Id.* at 1156.

■ This method of proof—establishing a set of circumstances which together raise an inference of discrimination—has been applied in cases arising under the ADEA.[4] We have recently approved the use of *McDonnell Douglas* principles in ADEA cases, since the ADEA was "'derived *in haec verba* from Title VII.'" *Geller v. Markham,* Nos. 80–7087, 80–7089, slip op. at 475–76 (2d Cir. Dec. 8, 1980), *quoting Lorillard v. Pons,* 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978).

## 1. *Applied to Stanojev*

■ . Stanojev was unable to establish all the requirements of the *McDonnell Douglas* test. Although there was no doubt that Stanojev was in the protected class and was fired, there was no proof that he was replaced or that any new employee took over his work after he was discharged. In fact,

his position—Special Assignments—ephemeral to begin with, was eliminated upon his discharge.

No inference that the position from which he was dismissed might be filled by a younger person arises if there was no longer any position to fill. There was no basis for blaming management with discrimination because it did not create another new position for Stanojev in order to continue him on the payroll.

It is therefore clear that Stanojev could not prove his case by the suggested "set of circumstances" derived from *McDonnell Douglas.* Since he did not prove that he was replaced after the discharge, or even that the position was kept open, *cf. Powell v. Syracuse University,* 580 F.2d 1150, 1156 (2d Cir.), *cert. denied,* 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978) (gap of two years between nonrenewal of teaching contract and hiring of new teacher held not to preclude finding of replacement in university context), he has not proved that his dismissal resulted from anything other than a legitimate reason, *i. e.* elimination of the position or his own incompetence.[5] Therefore, an inference of discrimination could not be raised in this manner.

## B. *Other Methods of Proof of a Prima Facie Case*

The *McDonnell Douglas* (set of circumstances) formula is not the only logical

---

4. *See Smith v. University of North Carolina,* 632 F.2d 316, 332–33 (4th Cir. 1980); *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1014–16 (1st Cir. 1979); *Schwager v. Sun Oil Company of Pennsylvania,* 591 F.2d 58, 60–61 (10th Cir. 1979); *Cova v. Coca-Cola Bottling Company of St. Louis, Inc.,* 574 F.2d 958, 959 (8th Cir. 1978); *Price v. Maryland Casualty Co.,* 561 F.2d 609, 612 (5th Cir. 1977); *cf. Laugesen v. Anaconda Company,* 510 F.2d 307, 311–12 (6th Cir. 1975) (questioning use of *McDonnell Douglas* standards in jury instructions). However, it may be appropriate to depart from the formula of *McDonnell Douglas* in ADEA cases where there is direct or statistical proof of discrimination. *See Smith v. University of North Carolina,* 632 F.2d at 334–35; *Loeb v. Textron, Inc.,* 600 F.2d at 1014–19; *Marshall v. Goodyear Tire & Rubber Co.,* 554 F.2d 730, 735–36 (5th Cir. 1977); *Moore v. Sears, Roebuck and Co.,* 464 F.Supp. 357, 361–63 (N.D.Ga.1979); *cf. McDonnell Douglas Corp. v. Green,* 411 U.S.

802 n. 13, 93 S.Ct. 1824 (variable standard for prima facie case under Title VII).

5. Qualification for the position in question is also an element that must be proved in order to make a prima facie case by the set of circumstances method. *Furnco Construction Company v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). Although much of the time at trial was spent on the issue of Stanojev's qualifications, given our analysis, the jury's resolution of this point is unimportant. Whether or not Stanojev succeeded in establishing this element, he could not establish the full set of circumstances required for a prima facie case because he lacked any evidence of replacement. Since whether this element was proved need not be considered under our analysis, we leave for another day a discussion of the standard and burden of proof on a plaintiff as to this issue.

means of raising an inference that an employment decision (hiring or firing) was based on discriminatory considerations. *See generally, Loeb v. Textron, Inc.,* 600 F.2d 1003, 1018–19 (1st Cir. 1979).

1. One alternative means would of course be *direct* proof that the employer had discriminated on the basis of age. *See id.; Moore v. Sears, Roebuck and Co.,* 464 F.Supp. 357, 363 (N.D.Ga.1979); *cf. Gillin v. Federal Paper Board Company, Inc.,* 479 F.2d 97, 102 (2d Cir. 1973) (direct evidence of sex discrimination). Direct proof might sometimes be available if, for example, the employer had told the employee that he was being fired because of his age. *Cf. Gillin v. Federal Paper Board Company, Inc.,* 479 F.2d at 102 (sex discrimination). This kind of evidence, coupled with a firing (or refusal to hire) of a person in the protected age group, would support a finding that the firing was based on an impermissible criterion such as age. Stanojev did not produce any direct evidence of age discrimination. There was no evidence of a "youth movement" at Ebasco, nor was there any evidence of statements by Ebasco officers indicating a preference for younger employees. In fact, it came out at trial that many of Ebasco's vice presidents were over age 60. Stanojev himself was taken into the company at the executive level when he was already 11 years into the age bracket protected by the statute, 29 U.S.C. § 631(a) (Supp. II).

2. Statistical evidence also may be used to prove a prima facie case outside the *McDonnell Douglas* mold. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 337–40, 97 S.Ct. 1855–56, 52 L.Ed.2d 396 (1977) (statistical proof in race discrimination case); *Moore v. Sears, Roebuck and Co.,* 464 F.Supp. at 363.

Through statistical evidence, it may be possible to demonstrate a pattern of failure to hire or promote older persons, or an apparent policy of forced early retirement for older employees. *See generally, International Brotherhood of Teamsters v. United States,* 431 U.S. at 337–40, 97 S.Ct. 1855–56. Stanojev did not offer any statistical evidence.

3. Circumstantial evidence other than that discussed under the "set of circumstances" theory above could also support an inference of discrimination. There is therefore a third alternative avenue for a plaintiff seeking to make a prima facie case. For example, though lacking a direct statement or meaningful statistics, a plaintiff might be able to produce circumstantial evidence of a preference for younger employees in the defendant's organization. Such evidence, however, must, like the other methods of proof we have discussed, be logically related to a differential treatment of employees on the basis of age in order to support an inference that the plaintiff was fired because of his age.[6]

### C. *Evidence Offered by Stanojev*

The plaintiff had the burden of proving that he was discharged because of his age. *Geller v. Markham,* at 1032; *see Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 25, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978) (per curiam). The defendant was not required to prove that there was a justifiable cause for Stanojev's discharge. *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. at 25, 99 S.Ct. at 295. In *Loeb v. Textron, Inc.,* the First Circuit stated that an employer may fire a management-level employee, on the basis of subjective business judgments, for any reason that is not discriminatory. 600 F.2d at 1012

---

**6.** The issue in an age discrimination case is whether the employer is treating some people less favorably than others because of their age. *See Furnco Construction Co. v. Waters,* 438 U.S. at 577, 98 S.Ct. at 2949; *International Brotherhood of Teamsters v. United States,* 431 U.S. at 335 n. 15, 97 S.Ct. at 1854. A finding of discrimination may be predicated on a showing of differentiation in treatment, whether in termination or job replacement or relocation, between plaintiffs and other employees similarly situated and outside the protected age group . . . . *Robb v. Chemetron Corp.,* 17 F.E.P.Cases 1535, 1544 (S.D.Tex.1978).

n. 6 and 1019. In other words, the employer has the "prerogative to be shortsighted and narrowminded . . . ." *Drown v. Portsmouth School District*, 435 F.2d 1182, 1186 (1st Cir. 1970), *cert. denied*, 402 U.S. 972, 91 S.Ct. 1659, 29 L.Ed.2d 137 (1971). At trial Stanojev sought to prove that Ebasco had tried to force early retirement on him, and then had fired him, because of the then impending change in the ADEA which extended the protected age group from age 65 to age 70. Evidence was introduced that the company had been considering the effects on all its employees of the ADEA amendment, as well as the financial effect of Stanojev's retirement or dismissal on whatever pension rights he may then have had. Evidence was also introduced that Ebasco had not followed its written policy on the termination of employees in firing him. At the close of trial, he tried to bolster his case through an instruction, granted by the judge, allowing an inference adverse to Ebasco from its nonproduction of certain personnel documents.

### 1. *The ADEA Amendment*

#### a. *Ebasco's Study of the Law*

█ Stanojev produced evidence at trial that Ebasco was aware of the impending amendment to the ADEA and was studying its likely effect. Stanojev attempts to draw an inference from these facts that Ebasco was motivated by the imminent change in the law to seek to force him into early retirement or to fire him at age 63. The trial court properly removed this issue from the jury as not constituting a reasonable basis for such an inference. It is both the practice and the duty of corporations to study changes in the law which affect them; no inference that they intend to violate the law arises from such study.

#### b. *Stanojev's Pension Plans*

█ During July and August of 1978, the period just preceding Stanojev's termination in October 1978, Ebasco's financial department prepared figures on pensions to be paid to Stanojev using several hypothetical retirement dates. (The dates were: October 1978; January 1, 1979; and January 1, 1981.) Stanojev tried to connect this fact with the impending change in the ADEA and again stresses that this provided a motive for his firing. But again, no inference of discrimination can be made. First, it is reasonable for a company considering the termination of one of its employees to consider the financial effect of such a decision; the employee's age is one factor in the pension equation. This in no way demonstrates that the firing was *because of* the employee's age. The figures were given to Stanojev so that he might choose which retirement date he preferred. Whether he ought to accept the pension benefits available to him at early retirement, or defer taking them to a later date when the annual payments would be larger was a choice for Stanojev to make. That his dismissal gave him that opportunity does not mean that he was dismissed in order to force him to make the choice.

Second, Ebasco could derive no financial benefit through Stanojev's retirement before the effective date of the ADEA amendment. Mr. Sherman, who was in 1978 President of Ebasco, testified that Ebasco's contribution to the employee's pension increased each year until age 65, and then remained constant. This practice was permitted to continue under the new law. The cost increase after the employee reached age 65 was therefore negligible. No inference of discrimination can be drawn from Ebasco's consideration of pension plans.

### 2. *Ebasco's Termination Procedures*

█ Stanojev's only other type of proof was his charge that Ebasco did not follow its avowed personnel procedure with respect to termination when it fired him. From this alleged fact Stanojev contends that his discharge was based not on the incompetence with which Ebasco had charged him, but on an impermissible reason: his age. As with the evidence of Ebasco's study of the ADEA, however, Stanojev's evidence on this matter falls far short of proof sufficient to raise an inference of age discrimination.

Stanojev introduced evidence of an Ebasco procedure, which had been adopted approximately one year before his discharge, which is recorded in Ebasco's personnel manual as follows:

An employee should normally receive at least two official warnings documented and forwarded to the Personnel Department—Employee Relations prior to his/her actual termination (except in cases of serious misconduct where the first offense may result in discharge). These warnings should be given verbally to the employee. No written statement or record of these warnings shall be given to the employee concerned. However, all warnings should be recorded by the supervisor and/or Department Head in a memorandum which should be prepared immediately and forwarded to the Employee Relations Manager. Warning documentation will come from field locations to the Construction Manpower Administrator.

No dispute exists as to the fact that Stanojev had received warnings, both before and after the effective date of the policy; it is equally undisputed that no written documentation of these warnings was ever forwarded to the Personnel Department.

Several factors militate against any inference being drawn from the existence of this procedure. First, there was no evidence that it had ever been applied, or was ever intended to be applied at the management level. Stanojev, it must be remembered, was a vice president far above the rank even of supervisor. This fact is not diminished by the fact that he had ceased to have responsibility over numbers of other employees. Nothing on the face of the personnel procedure itself would indicate that it was meant to apply at the management level. In fact, the references to "Employee Relations," "supervisor," and "Department Head" lead to the opposite conclusion. Indeed, it refers to the rank and file of construction workers in the field, not to the management superstructure.

Furthermore, the fact is that Stanojev actually had been warned. Whether the warnings were recorded or not is of no significance.

The final point which determines that Ebasco's alleged failure to follow this policy does not justify an inference of discrimination is that there is no evidence that Stanojev was treated any less favorably than any other management employee who was discharged. The essence of a complaint such as Stanojev's under the ADEA is that the plaintiff has been treated less favorably than others on account of his age. *See Furnco Construction Co. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); *International Brotherhood of Teamsters v. United States,* 377 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1814, 52 L.Ed.2d 396 (1977); *Robb v. Chemetron Corp.,* 17 F.E.P. Cases 1535, 1544 (S.D.Tex.1978); *cf. Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032, 1039 (2d Cir. 1979) (showing of disparate treatment in Fair Housing Act case). Yet there is no showing, in Stanojev's attempted proof on this point, that he was discharged in a manner which was procedurally inferior to that which was or would be used with any other management employee regardless of age.

### 3. *Nonproduction of Personnel Records*

Ebasco's failure to produce certain personnel records at trial does not resuscitate his unproved charge that his discharge was based on his age. Once again, this fact does not establish, or help to establish, a prima facie case because it bears no logical relationship to a finding of age discrimination. The materials that Ebasco failed to produce consisted of "management succession charts" relating to the period that Stanojev was in the Business Development department. The charts contained promotion evaluations. Ebasco explained that it had discarded these records when it moved its corporate headquarters in 1979. Not only were the documents from a time period prior to Stanojev's assumption of the position from which he was discharged, but Ebasco offered a reasonable explanation for their nonproduction. It is unlikely that documents containing evaluations relevant

to an earlier time and prior positions would support a charge that Stanojev's dismissal in 1978 was the result of age discrimination. Thus, although Ebasco's nonproduction of these documents might have been relevant to show pretext had Stanojev established a prima facie case, the nonproduction alone does not support an inference of discrimination.[7]

### D. *Recapitulation*

Since Stanojev was not replaced after he was fired, he was not able to establish a prima facie case by the "set of circumstances" derived from *McDonnell Douglas*. Nor did Stanojev establish a prima facie case by any other method. There was no direct or statistical proof of age discrimination at Ebasco. Stanojev's evidence was circumstantial, but it failed to show any conduct on the part of Ebasco which could be logically linked to a finding that Stanojev was dismissed because of his age. We believe that this is so clear that reasonable minds could not differ and that the defendant's motion for a directed verdict should have been granted.[8]

Reversed and remanded for proceedings not inconsistent with this opinion.

---

**7.** The judge charged the jury with respect to the "records not produced at trial" that:

> you. may, but you need not, draw an inference adverse to the person or corporation having custody of such record, by reason of not producing these records which ordinarily in its regular course of its business ought to have been in the files.
>
> If you draw such an inference, you will consider the explanation, if any, for the missing documents.
>
> Plaintiff claims that documents are missing in the files which if produced would prove that he was rendering satisfactory or even complimented work at his job prior to the time it was decided to terminate his services.

If it were assumed that the other evidence was sufficient to make out a prima facie case, the jury could have been allowed to draw such an adverse inference. *See San Antonio v. Timko*, 368 F.2d 983, 985 (2d Cir. 1966). But that inference could not serve to supply the missing element of a prima facie case, namely, replacement of Stanojev by a younger employee or keeping the post open to receive one.

The charge was not helpful because it did not say what inference could be drawn. Consider-

ing what inference may be drawn in the analogous case of failure of a party to call a witness that would ordinarily be favorable to him, Judge Friendly made the perspicacious observation:

> It would have been more accurate to characterize the inference ... as permitting the jury "to give the strongest weight to the evidence already in the case in favor of the other side ...." The jury should not be encouraged to base its verdict on what it speculates the absent witnesses would have testified to, in the absence of some direct evidence.

*Felice v. Long Island Railroad Co.*, 426 F.2d 192, 195 n. 2 (2d Cir.), *cert. denied*, 400 U.S. 820, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970) (citations omitted). We do not believe that an inference that Stanojev was discharged on account of his age can logically be drawn from the failure of the defendant to produce the management succession charts.

**8.** Because we have reached this result, we need not consider Ebasco's other claims on appeal.