Joyce STRATTON, Plaintiff,

v.

The DEPARTMENT FOR THE AGING FOR the CITY OF NEW YORK, The City of New York and Prema Mathai–Davis, Defendants.

No. 91 Civ. 6623 (SAS).

United States District Court, S.D. New York.

March 12, 1996.

Jeffrey C. Slade, Leventhal Slade & Krantz, New York City, and Mark J. Stratton, New York City, for plaintiff.

Masako Shiono, Susan Hartzell, Assistant Corporation Counsels, Office of The Corporation Counsel, New York City, for defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge:

After a five day trial in this age discrimination action, the jury returned a verdict for Plaintiff Joyce Stratton. The jury found that age was a determinative factor in Defendants' decision to terminate Plaintiff's employment at the New York City Department for the Aging, and/or their decision not to recall or rehire her. The jury also found that the decision not to rehire Plaintiff was motivated by a desire to retaliate against her for filing an age discrimination claim, and that Defendants' violation of the law was willful. The jury awarded Plaintiff $500,000 in damages.[1]

A variety of post-trial motions are now before this Court. Defendants move, pursuant to Fed.R.Civ.P. 50(b), for judgment as a matter of law on Plaintiff's claims of disparate treatment and retaliation.[2] Defendants also move, pursuant to Fed.R.Civ.P. 59(a), for a new trial on the grounds that the jury reached a "seriously erroneous" result because of the Court's wrongful admission of statistical evidence. Finally, Defendants move for a new trial, or a substantial remittitur, on the grounds that the jury's award was "clearly excessive." Plaintiff not only opposes each of these motions, but has cross-moved for an award of front pay and the restoration of her full pension and social security benefits.

For the reasons set forth below, Defendants' motion for judgment as a matter of law is denied, as is their motion for a new trial based on the erroneous admission of statistical evidence. Defendants' motion for a new trial based on the excessiveness of the jury's verdict is denied on the condition that Plaintiff consent to a remittitur. Finally, Plaintiff's motion for front pay and the restoration of her benefits is granted.

## I. Factual Background

Plaintiff Joyce Stratton was the Director of the Central Information and Referral Bureau of the New York City Department for the Aging ("DFTA") from 1975 until 1991. In this capacity, Plaintiff managed a staff of up to 35 that provided a wide array of information and services to New York City's elderly citizens. At the time of her dismissal in 1991, Plaintiff was 61 years old. Trial Transcript ("Tr.") at 42, 58, 74, 101, 103.

In 1990, Defendant Prema Mathai–Davis, who was then 39 years old, was appointed Commissioner of the Department for the Aging. Tr. at 20. Approximately a year after Dr. Mathai–Davis' appointment, on February 22, 1991, Dr. Stratton's employment was terminated. Tr. at 103. At trial, Plaintiff asserted that her dismissal was motivated by age discrimination; specifically, Plaintiff argued that Dr. Mathai–Davis demonstrated a marked preference for staff closer to her own age. Tr. at 664. Defendants dispute that age played any role in the decision to terminate Dr. Stratton's employment. At trial, Dr. Mathai–Davis and other defense witnesses testified that the decision had been dictated by budget cuts which forced them to eliminate 17 positions at the Central Information and Referral Bureau. Tr. at 436, 442, 493.

---

1. Under the Age Discrimination in Employment Act ("ADEA"), this award was automatically doubled because of the jury's finding that Defendants' actions were "willful." *See* 29 U.S.C. § 626(b).

2. Defendants also contend that the court should overturn the jury's finding that its actions were "willful."

After Plaintiff was terminated, she made significant efforts to find other comparable employment, but was unsuccessful. Tr. at 110–113. Although other employees who were laid off by DFTA in 1991 were eventually rehired, Plaintiff was never asked to return to her old job. *See* Deposition of Jean McEwan at 11, 16–17; Tr. at 120. At trial, Plaintiff asserted that Defendants' refusal to rehire her was motivated in part by a desire to retaliate against her for filing an age discrimination claim. Specifically, Plaintiff alleged that Defendants failed to adequately consider her for the position of Director of the Bureau of Benefits and Entitlements, a new position created in 1992; and that Defendants ultimately selected a person far less qualified than she for the position. Tr. at 124–25, 674, 675.

## II. *Legal Standard for Judgment as a Matter of Law or a New Trial*

Fed.R.Civ.P. 50(a)(1) sets forth the standard for granting a motion for judgment as a matter of law:

> If during a trial by jury a party has been fully heard on an issue and there is *no legally sufficient evidentiary basis* for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue (emphasis added).

Such a motion may only be granted when "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or [where there is] such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [the movant]." *Logan v. Bennington College Corp.*, 72 F.3d 1017, 1022 (2d Cir.1995) (internal quotation omitted).

When deciding a motion brought under Rule 50, the Court may not weigh the evidence or assess the credibility of witnesses. Instead, the Court must view the evidence in the light most favorable to the non-moving party, giving it the benefit of all legitimate inferences that may be made in its favor. *See Samuels v. Air Transport Local 504*, 992 F.2d 12, 14–16 (2d Cir.1993); *Banff Ltd. v. Express, Inc.*, 921 F.Supp. 1065, 1067 (S.D.N.Y.1996).

The standard for granting a motion for a new trial is less restrictive. Such a motion may be granted if the jury's verdict is "seriously erroneous" or constitutes a "miscarriage of justice." *See Purnell v. Lord*, 952 F.2d 679, 686 (2d Cir.1992); *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970 (2d Cir.1987). The Court may find that "a miscarriage of justice" has occurred if the jury's verdict is "against the weight of the evidence," or if the "the trial was not fair to the moving party." *See Mallis v. Bankers Trust Co.*, 717 F.2d 683, 691 (2d Cir.1983). However, "the grant of a new trial on weight of evidence grounds should be reserved for those occasions where the jury's verdict was egregious." *Dunlap–McCuller v. Riese Organization*, 980 F.2d 153, 158 (2d Cir.1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 290, 126 L.Ed.2d 239 (1993).

## III. *Judgment as a Matter of Law*

Defendants assert that they are entitled to judgment as a matter of law on Plaintiff's claims for disparate treatment and retaliation. Defendants maintain that Plaintiff failed to prove that age was a determinative factor in either their decision to terminate her employment or their decision not to recall or rehire her. Further, Defendants maintain that there is no evidence supporting the jury's finding that Defendants' decision not to rehire Plaintiff was motivated by a desire to retaliate against her for filing an age discrimination claim. For the reasons discussed below, neither of Defendants' contentions has merit.

### A. *Disparate Treatment Claim*

To state a prima facie case of age discrimination under the Age Discrimination in Employment Act ("ADEA"), Plaintiff had to demonstrate that: (1) she was 40 years of

age or older; (2) her employment was terminated, or she was not recalled or rehired; (3) she had satisfactorily performed her job; (4) her discharge occurred under circumstances giving rise to an inference of age discrimination. *See Gallo v. Prudential Residential Services, Ltd.,* 22 F.3d 1219, 1225 (2d Cir. 1994) (citation omitted). Defendants concede that Plaintiff satisfied the first three elements of this test; however, they contend that she failed to demonstrate that she was discharged under circumstances raising an inference of age discrimination.

Plaintiff offered more than enough evidence to raise an inference that she was a victim of age discrimination. The evidence revealed that Dr. Stratton had repeatedly received "very good" and "outstanding" evaluations prior to her termination. Tr. at 75–78. The evidence also demonstrated that, almost immediately after Plaintiff's employment was terminated, DFTA handed over a good portion of her responsibilities—as well as her office—to a younger and less qualified person. *See* Deposition of Kitty Williston at 47, 54. Indeed, the evidence revealed that in the fourteen months after Prema Mathai–Davis took over as Commissioner of DFTA, the average age of DFTA's highest ranking officials declined by almost five years. *See* Plaintiff's Trial Exs. 241, 242.

At trial, Defendants asserted that Plaintiff was laid off because of a budget crisis the city faced in 1991. However, there was ample evidence for the jury to deem this defense a mere pretext and to conclude that age was the real reason for Defendants' actions. Plaintiff presented evidence that even before she was laid off, she was subjected to adverse treatment under Defendant Mathai–Davis' administration. She testified that she was excluded from closed door meetings held between her staff and her supervisor; that she was told not to participate any longer on task forces and committees on which she was serving; that her administrative staff was taken away from her, including her secretary, administrative assistant and technical writer; and that she was excluded from a management retreat similar to previous ones she had attended. Tr. at 80–82, 89–92.

More importantly, Plaintiff presented evidence that Defendants knew that the "budget crisis" would not have much lasting impact, and that someone would still be needed to perform Plaintiff's duties. She offered proof that Defendants knew that many of the city funded workers they laid off would be replaced with federally funded ones who would require even more supervision. Tr. at 493–494; Defendants' Ex. X. She demonstrated that the New York State Office for the Aging, which oversees DFTA's implementation of federal mandates, had expressed serious concern about any reduction in the services provided by the Bureau of Central Information and Referral, and ultimately forced DFTA to increase its staff and add a full-time manager. Tr. at 555–557; Plaintiff's Exs. 75, 76. Indeed, Plaintiff showed that by the end of 1991, DFTA was actively seeking and would ultimately hire a full time person as Director of Central Information and Referral, the same job title Plaintiff had held. Her name was Jean McEwan, and she was almost 26 years younger than Plaintiff. Plaintiff's Ex. 242A; Deposition of Jean McEwan at 11, 16–17.

Defendants' claim that there is no "legally sufficient evidentiary basis" for the jury's finding of disparate treatment is thoroughly refuted by the evidence presented at trial. Defendants' motion for judgment as a matter of law on this claim is therefore denied.

### B. *Retaliation*

To state a prima facie claim for retaliation under the ADEA, Plaintiff had to show: (1) that she engaged in activity protected by the ADEA; (2) the occurrence of an adverse employment decision; and (3) a causal connection between the protected activity and the adverse employment decision. *See DeCintio v. Westchester Co. Medical Center,* 821 F.2d 111, 115 (2d Cir.1987), *cert. denied,* 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987). Defendant concedes that Plaintiff engaged in a protected activity—the filing of an age discrimination complaint with the EEOC in May 1991. Defendant also does not dispute that Plaintiff suffered an adverse employment decision (i.e., Defendants declined to recall her or

hire her as Director of the Bureau of Benefits and Entitlements). However, Defendants argue that Plaintiff failed to prove any causal connection between her filing of the EEOC complaint and Defendants' failure to recall her or to hire her as Director of the Bureau of Benefits and Entitlements.

■ Proof of causal connection can be established indirectly by demonstrating that the protected activity was followed closely by discriminatory treatment. *See id.* Plaintiff offered proof that she suffered discriminatory treatment soon after filing her complaint. She demonstrated that others who were laid off in 1991, like Jean McEwan, were recalled by DFTA, but that she was not. Deposition of Jean McEwan at 11, 16–17; Tr. at 120. Most tellingly, she proved that she was treated differently from all the other applicants for the position of Director of the Bureau of Benefits and Entitlements. Tr. at 480–481, 489. Specifically, Plaintiff was the only applicant not interviewed by Michael Rabin, the person who made the hiring recommendations to the Commissioner. Tr. at 482. Instead, Plaintiff was interviewed by DFTA's Personnel Director, who had no knowledge of Plaintiff's skills in the area of benefits and entitlements and who did not even attempt to learn of her previous accomplishments at DFTA. Tr. at 395, 401.

The jury was perfectly justified in finding that this evidence was sufficient to create an inference that Defendants were retaliating against Plaintiff for filing an age discrimination claim. The jury was also justified in rejecting Defendants' non-retaliatory reason for not hiring Plaintiff—that she was not the most qualified person for the job of Director of the Bureau of Benefits and Entitlements. Plaintiff offered ample evidence that her educational background and work experience made her eminently qualified for this position. In fact, Defendants' own witness conceded that, under Plaintiff's direction, the Bureau of Central Information and Referral had become DFTA's principal source for information about benefits and entitlements for the elderly.[3] Tr. at 561.

■ The jury had a "legally sufficient evidentiary basis" for concluding that Defendants acted in a retaliatory manner in failing to recall Plaintiff and/or in declining to hire her as Director of the Bureau of Benefits and Entitlements. The jury's finding was based not on "sheer surmise or conjecture," but on evidence presented at trial. Defendants' motion for judgment as a matter of law on this claim is therefore denied.[4]

## IV. *The Statistical Evidence*

■ Defendants assert that they are entitled to a new trial because the Court erred in admitting statistical evidence which was prejudicial to their case. Specifically, Defendants object to the admission of two charts. The first showed the average age of DFTA's highest ranking officials before Dr. Mathai–Davis took over as Commissioner; the second showed the average age of such officials fourteen months after she became Commissioner.[5] Defendants contend that

---

3. The manner in which Plaintiff learned of this job opening provided further evidence of a retaliatory motive. Despite Plaintiff's obvious qualifications and the fact that she had filed a resume with the Personnel Redeployment Center, which aims to match laid off city employees with available new jobs, nobody from DFTA or the city ever contacted her. Instead, Plaintiff read about the position in the *New York Times.* Tr. 118, 120, 121.

4. Defendants also contend that Plaintiff failed to prove that they "willfully" violated the ADEA. This claim is belied by the record. Under the ADEA, a violation is willful if the employer knew or showed reckless disregard for whether its conduct was prohibited by the ADEA. *See Hazen Paper Co. v. Biggins,* 507 U.S. 604, 615, 113 S.Ct. 1701, 1709, 123 L.Ed.2d 338 (1993). The evidence demonstrated that before Plaintiff's em-

ployment was terminated, she employed counsel who met with DFTA officials and told them that dismissing her would constitute an act of age discrimination. Tr. at 472–474, 494–496. Under these circumstances, the jury could justifiably conclude that Defendants knew that their conduct violated the ADEA, or showed reckless disregard for whether it did.

5. Defendants also object to the fact that Plaintiff was permitted to identify the ages of the eleven managers Dr. Mathai–Davis took credit for hiring or promoting. Defendants argue and cite cases for the proposition that eleven employment decisions are too small a statistical sample to be meaningful. *See, e.g., Haskell v. Kaman Corp.,* 743 F.2d 113, 119 (2d Cir.1984) (ten terminations over eleven years too few to be statistically reliable). The challenged evidence constitutes

such evidence should not have been admitted without testimony from expert witnesses explaining its significance.

This evidence was properly admitted. In *Schulz v. Hickok Mfg.*, 358 F.Supp. 1208 (N.D.Ga.1973), the court permitted the introduction of similar raw statistics showing that the average age of a group of managers had dropped by nearly 13 years in an 18 month period. The court noted that although such "statistics are not conclusive proof an employer's reasons for any particular discharge[,] they are relevant simply on the question of motive." *Id.* at 1213.

In permitting the statistical evidence here, the Court was careful to construct a charge which cautioned the jury not to attach too much importance to the evidence at issue. The jury was instructed that

> . . . the statistics plaintiff showed you are not conclusive proof in any way of an employer's reasons for a particular discharge. They may be relevant simply on the question of motive. Naturally, it is for you to decide what relevance, if any, they have regarding defendants' motives.

Instructions to Jury, at 11. Thus, there was little danger that the jury would view the statistical evidence as sufficient proof that Defendants had discriminated against Plaintiff in discharging her.

Defendants cite a number of cases in support of their argument that Plaintiff's statistical evidence should not have been admitted. None of these cases is directly on point. Plaintiff relies on only one case from this Court and it does not deal with the admissibility of statistical evidence. Rather, the

Court addressed the issue of whether the proffered statistical evidence was *alone* sufficient to prove that defendant's stated reason for its employment decision was pretextual. *See Halbrook v. Reichhold Chemicals, Inc.*, 766 F.Supp. 1290, 1301–1302 (S.D.N.Y.1991), *aff'd*, 956 F.2d 1159 (2d Cir.1992).[6] This issue is irrelevant here, where the disputed statistical evidence was accompanied by a variety of other evidence that Defendants acted in a discriminatory manner.

Defendants point to several cases in which courts have declined to admit statistical evidence without explanation from expert witnesses. *See, e.g., Carter v. Ball*, 33 F.3d 450, 456–57 (4th Cir.1994) (a judge may be justified in choosing to exclude statistical evidence offered without expert testimony concerning methodology or relevance); *Wingfield v. United Technologies Corp.*, 678 F.Supp. 973, 983 (D.Conn.1988) (precluding introduction of raw statistics without expert testimony to explain standard deviation). None of these cases, however, establishes that expert testimony is an absolute prerequisite to the admission of statistical evidence. Naturally, the usefulness of statistics depends largely on the surrounding facts and circumstances. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 340, 97 S.Ct. 1843, 1857, 52 L.Ed.2d 396 (1977). In the instant action, where the proffered evidence was easily understandable, and the jury was carefully instructed as to its consideration of such evidence, the admission of this evidence was not error. Accordingly, Defendants' motion for a new trial based on this alleged error is denied.

circumstantial proof of Dr. Mathai–Davis' preference for younger employees, and was properly admitted. *See Stanojev v. Ebasco Services, Inc.*, 643 F.2d 914, 921 (2d Cir.1981) (a plaintiff may offer circumstantial evidence of an organization's preference for younger employees). Defendants overlook the fact that the eleven employment decisions here do not constitute a "sample," but the entire universe of managers hired or promoted by Dr. Mathai–Davis. These decisions, made by a single person over only a four year period, were thus properly admitted as circumstantial evidence of improper motive.

Even accepting Defendants' claim regarding the admissibility of this evidence, a new trial would not be warranted. This was only one

small part of the evidence presented by Plaintiff, and its admission could not have severely prejudiced the jury. *See Lightfoot v. Union Carbide Corp.*, 901 F.Supp. 166, 169 (S.D.N.Y.1995) (prejudice from admission of evidence not "so extreme as to warrant a new trial").

**6.** Plaintiff also cites *Fisher v. Vassar College*, 70 F.3d 1420, 1441–47 (2d Cir.1995), *reh'g en banc granted* (Feb. 16, 1996), in which the Second Circuit recently rejected the validity of a plaintiff's proffered statistics in an age and sex discrimination suit. In that case, however, the statistical evidence was deeply flawed, and the court specifically found that "[p]laintiff's statistical case is built on gerrymandered data and a series of statistical fallacies." *Id.* at 1443.

## V. Excessive Damages

 Defendants assert that they are entitled to a new trial or a substantial remittitur because the jury's damage award is not supported by the evidence. A new trial may be granted where the amount of the jury's verdict is "clearly excessive." *See Paturzo v. Metro–North Commuter Railroad,* 751 F.Supp. 1086, 1087 (S.D.N.Y.1990). "The standard for review of damage awards is whether the reward is so high as to shock the judicial conscience, constituting a denial of justice." *Id.* On a motion for a new trial,

> [t]he trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts; and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge's duty is essentially to see that there is no miscarriage of justice. If convinced that there has been, then it is [her] duty to set the verdict aside; otherwise not.

*Bevevino v. Saydjari,* 574 F.2d 676, 684 (2d Cir.1978).

### A. Excessive Award

 A careful review of the record demonstrates that the jury's award is clearly excessive. At trial, Plaintiff presented evidence that she would have received a 4.5% raise in 1992; that in late 1992 she should have been hired as Director of the Bureau of Benefits at a salary of $70,000; and that the value of fringe benefits associated with her employment at DFTA was equal to 35% of her salary. Tr. at 135, 410, 480–82, 489, 561. If the jury accepted all of this evidence as true, Plaintiff's total lost wages and benefits would equal a maximum of $415,448.23. This figure, which includes no discount for Plaintiff's post-termination earnings, is $84,551.77 less than the jury awarded.

Plaintiff offers several explanations for this discrepancy. She contends that $14,705.90 of it is attributable to money she should have received for annual leave and sick leave that had vested by the time she lost her job. The remainder, she asserts, consists either of an award of prejudgment interest, or of pension and/or social security benefits that the jury determined she lost when her job was terminated.

Plaintiff's explanations are not supported by the record. The evidence demonstrated that Plaintiff received payment for all of the annual leave and sick leave to which she was entitled; indeed, Plaintiff's counsel did not even ask the jury to provide such compensation when he described her damages in his closing argument. Tr. at 510–512, 678–79. The jury could not properly have awarded interest, since it heard no evidence regarding prevailing interest rates and received no instruction authorizing an award of interest. Nor can the discrepancy be explained as an award of lost social security and pension benefits. Although Plaintiff presented evidence that she received benefits at DFTA equal to 35% of her salary, she did not present any evidence of pension or social security benefits not included in that 35% figure.

### B. Post–Termination Earnings

 The jury erred in failing to subtract from its award $33,562 in post-termination pension benefits that Plaintiff would not have received if she had continued working at DFTA. *See* Defendants' Exs. YYY, ZZZ. This payment should have been setoff against any award of back pay. *See Hagelthorn v. Kennecott Corp.,* 710 F.2d 76, 86–87 (2d Cir. 1983). Otherwise DFTA would, in effect, be paying Plaintiff wages and retirement benefits for the same period. *See Promisel v. First American Artificial Flowers, Inc.,* 943 F.2d 251, 258 (2d Cir.1991), *cert. denied,* 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992).

 Unemployment benefits Plaintiff received after her dismissal must also be deducted from her back pay award.[7] The question of "[w]hether unemployment compensation and social security benefits should automatically be deducted from an award of

---

**7.** These benefits totalled $8,000. *See* Defs. Ex. XXX.

lost wages has not been answered by this circuit." *Id.* Where courts have declined to deduct unemployment benefits, they have cited the "collateral source rule," which provides that a tortfeasor should not benefit from the fact that a plaintiff has received funds from a third party as a result of her injury. *See, e.g., Dailey v. Societe Generale,* 889 F.Supp. 108, 113 (S.D.N.Y.1995); *Gaworski v. ITT Commercial Finance Corp.,* 17 F.3d 1104, 1112–13 (8th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 355, 130 L.Ed.2d 310 (1994).

▮ The "collateral source rule" does not apply here because the City of New York is the entity which effectively pays Plaintiff's unemployment compensation.[8] *See Williams v. Secretary of the Navy,* 853 F.Supp. 66, 72 (E.D.N.Y.1994) (declining to apply collateral source rule because "the source of federal employees' unemployment compensation is not collateral, but effectively is the federal employer"). Defendants are therefore entitled to have the unemployment compensation Plaintiff received deducted from her back pay award.[9]

The jury's back pay award is "clearly excessive" and to let it stand would result in a "miscarriage of justice." The maximum the jury could have allocated for lost wages and benefits, without any setoff for post-termination earnings, is $415,448.23. Moreover, $41,562 must be deducted from this amount for pension and unemployment benefits Plaintiff received after February 22, 1991. The jury's back pay award must therefore be reduced to $373,886.23, the maximum amount that would not be excessive.[10] *See Earl v. Bouchard Transp. Co.,* 917 F.2d 1320, 1328–30 (2d Cir.1990). If Plaintiff does not con-

sent to this reduction, a new trial will be granted.

### VI. *Front Pay and Benefits*

▮ Plaintiff moves for an award of front pay and the restoration of the full pension and social security benefits that would have accrued had she continued working at DFTA. An award of front pay is an appropriate remedy under the ADEA in certain limited circumstances. *See Whittlesey v. Union Carbide Corp.,* 742 F.2d 724, 729 (2d Cir.1984). As this Court has explained:

> An award of front pay presupposes, first, that reinstatement is either impossible or impracticable. Second, a front pay award is appropriate and may even be necessary "in cases where the factfinder can reasonably predict that the plaintiff has no reasonable prospect of obtaining comparable alternative employment." Finally, front pay may properly be awarded where calculation of both the plaintiff's likely mitigated earnings and the income plaintiff would likely have earned if he or she had continued in the defendant's employ do not involve "undue speculation."

*Bonura v. Chase Manhattan Bank, N.A.,* 629 F.Supp. 353, 362, n. 3 (S.D.N.Y.), *aff'd,* 795 F.2d 276 (2d Cir.1986) (quoting *Whittlesey,* 742 F.2d at 729).

▮ In the instant case, front pay is entirely appropriate. Defendants concede that Plaintiff's reinstatement is impracticable. *See* Defendants' Reply Memo at 13. Moreover, it is clear from the evidence presented at trial that Plaintiff, now 66 years of age, has no reasonable prospect of obtaining a position similar to that she held at DFTA.

---

8. Plaintiff's unemployment benefits were paid directly to her by the New York State Department of Labor. However, the City of New York elects under New York Labor Law §§ 565.4 and 565.5 to make payments for the unemployment compensation claims paid out to its former employees, rather than making contributions to the state unemployment insurance fund. *See* Affidavit of Beverly Session, Acting Director of the Unemployment Insurance Division of the New York City Department of Personnel, dated March 8, 1996, at 1–2. The City is thus effectively responsible for paying Plaintiff's unemployment benefits.

9. In his closing argument Plaintiff's counsel conceded that after she left DFTA, Plaintiff held one part time job that she could not have held if she had continued working there. Tr. at 679. However, the evidence did not reveal the exact amount that Plaintiff earned from this job, only that it was not in excess of $5,000. Tr. at 132. Because the exact amount does not appear in the record, and because Defendants have failed to seek any reduction for these earnings here, no further reduction is warranted.

10. Because the jury's finding of "willfulness" stands, this amount is doubled to $747,772.46.

After her employment was terminated, Plaintiff searched diligently for other full time work, but her efforts proved futile. Tr. at 110–113, 117.

■ Awarding front pay here would not require the Court to engage in any "undue speculation." The jury implicitly found in its award that, absent discrimination, Plaintiff would have been appointed Director of the Bureau of Benefits and Entitlements and would have earned a salary of $70,000 a year. The jury also implicitly found that continuing to work at DFTA would not have prevented Plaintiff from earning money she made after February 1991 in various part-time jobs. Both of these propositions find support in the record. Tr. at 395, 401, 480–481, 489; Tr. at 132.[11] Plaintiff also testified that she intends to "keep working until [she] can't," Tr. at 135, and no evidence was presented which demonstrated that she would have retired or been dismissed for non-discriminatory reasons as of today's date.

Under these circumstances it makes perfect sense to award Plaintiff front pay until the age of 70, when her coverage under the ADEA will end. *See Whittlesey,* 742 F.2d at 729 (upholding award of front pay until age 70). To do otherwise "would leave the plaintiff irreparably harmed in the future by the employer's discriminatory discharge, and would permit the defendant's liability for its unlawful action to end at the time of judgment," resulting in a terrible "injustice." *Id.* at 728. As Plaintiff will not reach age 70 until February 5, 2000, she is entitled to four years of front pay at a salary of $70,000, which totals $280,000.[12]

Plaintiff should also be compensated for pension and social security benefits that would have accrued had she continued working at DFTA. However, as previously noted, since Plaintiff's damage award already includes 35% of back pay for "fringe benefits," she is not entitled to additional money for benefits that would have accrued prior to the jury's verdict. She is entitled to be compensated for benefits that would have accrued after the jury's verdict. To compute this amount, the Court will rely on the 35% benefits figure Plaintiff offered at trial. Tr. at 135. Accordingly, Plaintiff is awarded benefits equal to 35% of her front pay, or $98,000.

## VII. *Conclusion*

For the foregoing reasons, Defendants' motions for judgment as a matter of law and for a new trial based on the erroneous admission of statistical evidence are denied. Defendants' motion for a new trial on the excessiveness of the back pay award is denied on the condition that Plaintiff consent to a reduction of that award from $500,000 to $373,886.23. Finally, Plaintiff is granted front pay and benefits totalling $378,000.

SO ORDERED.

---

11. As noted, Plaintiff did hold one part-time job for a mental health service program in Brooklyn that she probably could not have performed while working at DFTA. However, it was clear from her testimony that she no longer holds this position. Tr. at 131–32.

12. Unlike the back pay award, this amount will not be doubled under the liquidated damages provision of the ADEA. *See Dominic v. Consolidated Edison Co. of New York,* 822 F.2d 1249, 1250 (2d Cir.1987) ("[A] discharged employee has no entitlement to liquidated damages equal to his front-pay award").