633 So.2d 1357 (1994)
W. Thomas KAMMERER, II
v.
SEWERAGE AND WATER BOARD OF NEW ORLEANS.
No. 93-CA-1232.
Court of Appeal of Louisiana, Fourth Circuit.
March 15, 1994.
Gary W. Bizal, Pierce & Bizal, New Orleans, for plaintiff/appellant.
Brian A. Ferrara, John D. Lambert, Jr., Jacob Taranto, III, Sewerage & Water Bd. of New Orleans, New Orleans, for defendant/appellee.
Before LOBRANO, PLOTKIN, JONES, WALTZER and LANDRIEU, JJ.
LANDRIEU, Judge.
Plaintiff, W. Thomas Kammerer, II, appeals the involuntary dismissal granted in favor of Sewerage and Water Board of New Orleans at the close of his case. We affirm.

FACTS
On September 30, 1986 at approximately 12:00 noon, while travelling westbound in the center lane on Gentilly Boulevard between the railroad overpass and Florida Avenue, plaintiff observed what appeared to be something sticking up out of the roadway. The unidentified object turned out to be a manhole cover sitting upright in the manhole. Due to the surrounding traffic, plaintiff could not avoid colliding with the manhole cover. As a result of the accident, Mr. Kammerer allegedly sustained cervical and lumbar sprains.
Ms. Joan Giron, who was also travelling westbound on Gentilly Boulevard behind Kammerer's vehicle, witnessed the incident. Ms. Giron testified that she observed Mr. Kammerer's inability to avoid the collision due to surrounding vehicles on the road. She further testified that after hitting the upright manhole, his vehicle spun out of control. In order to avoid a collision with Kammerer, Ms. Giron pulled into a nearby Shell service station. Seeing the manhole cover in the road, she attempted to assist Mr. Kammerer in his effort to drag the cover off to the side of the road.
The manhole cover at issue is the property of and maintained by the Sewerage and Water Board of New Orleans. Lyle Casimere, the supervisor of the crew which replaced the *1358 manhole cover on the date of the accident, stated at trial that the manhole cover in question was immediately destroyed by employees of the defendant, Sewerage and Water Board of New Orleans. It was normal procedure to maul the damaged covers at the scene before throwing them on the truck. This procedure was implemented as a safety precaution to the men due to the cover's weight. Mr. Casimere further testified that in his sixteen years with the company he had replaced numerous manhole covers and that none of the other destroyed covers had become the subject of litigation.
Plaintiff's expert, Gregory Hero, testified that in order for the manhole cover to be sitting upright and perpendicular to the road surface, "it has to have had a chip or crack out of it to allow it to stand vertically". He further testified that had he been able to examine the actual manhole cover, he could have determined the actual existence, nature, and duration of any breaks in the cast iron itself. "When you break cast irona fresh break is clean gray and shortly after, you get a rust haze, and at a later time, it gets a dark red-black rust color. So there is a gradation in time between a fresh break and one that is weathered."
The trial of this matter was bifurcated. At the close of plaintiff's case, the trial court granted the Sewerage and Water Board's motion for involuntary dismissal with prejudice. In its reasons for judgment, the trial court noted that the theory of spoliation or destruction of evidence is not applicable here, and that the plaintiff failed to show that the defendant had actual or constructive notice of a defect in the manhole cover or its upright posture.

DISCUSSION
Plaintiff contends that the trial court erred in failing to adopt and apply the spoliation of the evidence rule to the plaintiff's case which would have shifted the burden of proof to the defendant. Specifically, the plaintiff argues that because the defendant willfully and purposefully destroyed the evidence, i.e., the manhole cover, he was deprived of the opportunity to examine it.
The doctrine of spoliation is not applicable in the instant case because there was no intentional destruction of evidence for the purpose of depriving the plaintiff of its use. See Williams v. General Motors Corp., 607 So.2d 695, 698-99 (La.App. 4th Cir.1992). Although it does not alter the rule of law, it is worthy of note that suit and discovery were not begun in this matter until approximately a year after the accident and there is no evidence that the City was put on notice before suit was filed that the cover was needed as evidence.
We next consider whether the Sewerage and Water Board had actual or constructive notice of the defect in the manhole or cover, and, further, whether they had ample time to remedy the defect and failed to do so.
La.Rev.Stat.Ann. § 9:2800 (West 1991) provides, in pertinent part, that
... no person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.
In the instant case, the record is devoid of any evidence showing that the Sewerage and Water Board had notice, actual or constructive, of a defect with the particular manhole or cover in question. Both Mr. Kammerer and Ms. Giron testified that they travelled the Gentilly route often and had not observed the manhole cover out of place prior to the accident. Further, plaintiff's expert testified that it was unlikely for a manhole cover "in a heavy intersection" to be "off ... without someone reporting it".
Since the plaintiff failed to prove that the Sewerage and Water Board had actual or constructive notice that the manhole or cover was defective, the judgment of the trial court is affirmed.
AFFIRMED.
JONES, J., concurs.
*1359 WALTZER, J., concurs with reasons.
PLOTKIN, J., dissents with written reasons.
JONES, Judge, concurs:
I concur in the result reached by the majority and the concurrence. Nevertheless, I am also compelled to agree with the sentiments expressed in the dissent concerning spoliation of evidence by a professional defendant. Defendant, Sewerage and Water Board of New Orleans, cannot with impunity continue a policy of recognizing that property may be involved in litigation, and then maintain the policy of immediately destroying that property. However, because the record clearly supports a finding that the plaintiff cannot prevail in this litigation, I agree with the majority that the judgment of the trial court must be affirmed.
Plaintiff's own expert admitted that he would have had to examine the metal cover shortly after the accident to determine whether or not there was deterioration evidencing an old crack, from which one could infer constructive notice to the Sewerage and Water Board. However, since plaintiff delayed the filing of this suit until just prior to prescription, it would have been impossible to determine the age of the crack had defendant maintained the metal cover for that period.
Accordingly, I respectfully concur.
WALTZER, Judge, concurs with reasons.
I respectfully concur.
STATEMENT OF THE CASE
This is an appeal from a judgment of the trial court granting defendant/appellee's motion to dismiss plaintiff's petition. The motion was made and granted at the close of plaintiff's evidence at a trial on the merits.
Plaintiff/appellant, W. Thomas Kammerer, II (Kammerer), brought suit against defendant/appellee, Sewerage and Water Board of New Orleans (SWB) claiming damages allegedly sustained on 30 September 1986 when his automobile struck SWB's manhole cover on Gentilly Boulevard between Florida Avenue and the railroad overpass. Kammerer alleged negligence on the part of SWB and by amending petition set forth a strict liability claim.
The trial was bifurcated, and the liability issue was tried to the trial judge on 31 March 1993.

SUMMARY OF THE FACTS
On 30 September 1986 at midday, Kammerer, an architect and contractor by profession, was travelling westbound in the center lane of Gentilly Boulevard between Florida Avenue and the railroad overpass when he noticed something sticking up in the street. Traffic on both sides of his vehicle prevented Kammerer from striking the object, which was found to be a manhole cover. When Kammerer noticed the obstruction, he decided to try to veer to right or left rather than attempt to stop, in the belief that at the speed he was traveling he would be unable to stop before hitting the manhole cover. Kammerer testified that he was unable to avoid hitting the protruding manhole cover because of the proximity of vehicles on either side of his truck. He hit the cover with sufficient force to cause his truck to rise two feet off the ground, and could not offer an opinion as to whether the collision itself caused the cover to break into two pieces.
Joan Giron, whose car was following Kammerer's at the time of the accident observed his inability to avoid the protruding manhole cover, and his ensuing loss of control of his car. Giron testified that following the accident she and Kammerer attempted to drag the manhole cover to the side of the road.
Following the accident, the manhole cover lay between five and eight feet to the right of the manhole, and was broken into two pieces. Unable to drag the cover to the side of the road, Kammerer directed traffic around it for approximately ten minutes, whereupon the police arrived. About twenty or twenty-five minutes later, an SWB crew arrived on the scene, dragged off the pieces of the manhole cover, and replaced it with a new cover.
Kammerer testified that he was present when the SWB crew removed the damaged manhole cover, but did not ask the crew to preserve the cover or to allow him to examine or take custody of it.
*1360 Kammerer traveled this street regularly, and had not noticed any problem with this manhole cover prior to the accident. Kammerer introduced no evidence tending to prove that the manhole cover was displaced for any length of time prior to the accident.
Lyle Casimire (Casimire), Utility Supervisor II for the SWB, received a radio call to go to the scene of the accident, where he arrived at about 2:00 p.m. His log reflects he left the scene at 2:30 p.m. As crew foreman, he examined the casing in which the cover had rested, and found it to be without defect; his crew replaced the broken cover with a new cover, and, according to SWB policy, broke the already broken cover into smaller fragments had the fragments removed to the SWB truck and disposed of in a heap of scrap metal.
Casimire testified that he has replaced many broken manhole covers during his 16 year career with the SWB, and recalls none that have been involved in subsequent litigation.
Because the police were present, and gave him a police item number, and because Kammerer approached him concerning the accident, Casimire noted on his report a reference to "legal", meaning the SWB legal department. There was no evidence or allegation that Kammerer asked Casimire to preserve the manhole cover, nor did Kammerer ask to take custody of the cover. Neither Kammerer nor his counsel took any action to determine whether there was other evidence that the manhole cover was defective and in an upright position in the street for any length of time prior to the accident. In particular, there is nothing in the record to show that Kammerer or his counsel subpoenaed records of the SWB, City Department of Streets, district council member, or other entity to elicit complaints that might prove the City's actual notice of the allegedly defective manhole cover. Likewise, there is no showing that Kammerer or his counsel took even rudimentary investigatory measures such as interviews of residents and operators of commercial enterprises in the neighborhood in order to prove the City's constructive notice of the allegedly defective manhole cover.
Kammerer filed suit against the SWB on 31 August 1987, eleven months after the accident.
Plaintiff's expert witness, George Hero, testified that examination of the manhole cover could, under certain conditions, determine whether a break existed and how long the cover had been broken. Hero testified:
"When you break cast irona fresh break is clean gray and shortly after, you get a rusty haze, and at a later time, it gets a dark red-black rust color. So there is a gradation in time between a fresh break and one that is weathered.... Probably at around six months you get to the area where it's going to be a uniform color."

SPOLIATION OF EVIDENCE: THE COMMON LAW BACKGROUND
Generally, at common law, the intentional destruction of material evidence gives rise to an inference that the evidence would have been adverse to the interest of the party who destroyed it. The party is said to have admitted the adverse nature of the evidence by his or her conduct.[1]
The full effect of the adverse inference may be felt beyond the initial evidentiary question. Issues of sufficiency of evidence, meeting or shifting burden of proof, and rebuttable presumption of fault arise as well in this context.[2]
*1361 The admission theory proceeds from a notion that human nature dictates the likelihood that a party will be more willing to destroy adverse evidence than to make unavailable evidence tending to prove the validity of his cause.
The common law cases supporting the admission theory require a showing of bad faith. "Mere negligence is not enough, for it does not sustain the inference of consciousness of a weak cause." McCormick, supra at p. 191; Stanojev v. Ebasco Services, Inc., 643 F.2d 914, 923-24 (2d Cir.1981); Berthold-Jennings Lumber Co. v. St. Louis, Iron Mountain & So. Ry. Co., 80 F.2d 32 (8th Cir.1935), cert. denied 297 U.S. 715, 56 S.Ct. 591, 80 L.Ed. 1001. See also, Williams v. General Motors Corp., 607 So.2d 695, 698-699 (La.App. 4th Cir.1992).
The traditional rule at common law will not substitute the adverse inference for plaintiff's proof of an essential element of his or her case,[3] although there has been recent movement in some jurisdictions toward a relaxation of this rule.[4]

A LOUISIANA REMEDY FOR OBSTRUCTION OF OR INTERFERENCE WITH LEGAL REMEDIES
Counsel in argument and through written submissions have argued the propriety of recognizing the tort of spoliation of evidence. Indeed, this issue is the subject of both jurisprudential wrangling and legal scholarship in various common law jurisdictions.[5]
In Louisiana, the issue is not whether our courts recognize "the tort of destruction of civil evidence," as it is known at common law. *1362 As a civilian jurisdiction, Louisiana and its courts are not in the business of compartmentalizing and naming certain specific delictual concepts in a "pigeon-hole" approach to civil liability for damages. The Code, in its articles concerning offenses (La.C.C. 2315 et seq.) clearly defines our concept of tort as one of civil wrong.
"`Formerly, the French used the term "tort" but now they have discarded it in favor of the word delit, derived from the Latin term delictum.' ... As the drafters of both [the French and Louisiana] civil codes realized, no one could foresee all the possible types of civil injuries and accidents that might befall people. Accordingly, they treated delictual liability lapidarily; the civil codes contain only a handful of articles on the topic. In both France and Louisiana, the paucity and suppleness of relevant legal provisions enabled courts to discover their meanings in a wide range of unforeseen circumstances."[6]
Under a civilian analysis, then, we do not seek a Procrustean bed in which to force the plaintiff's claim to fit. We analyze the actions of the various parties to determine whether the particular action complained of violates a party's interest, whereupon resort is made to the specific remedy that will best achieve a just resolution of the controversy between the parties.
Louisiana's civil law recognizes Kammerer's interest in preservation of the SWB's manhole cover under the related concepts of access to the courts and the litigant's right to prove the elements of his claim.
Article 1 of the Louisiana Constitution of 1974 protects each citizen's right of access to the courts:
"All courts shall be open, and every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person, property, reputation or other rights." La. Const. art. 1 § 22.
This constitutional provision forms the bedrock on which the structure of our judicial system is constructed. Essential to the fabric of the construction is the citizen's right of access to the evidence necessary to prove his case, without which mere access to the courts would be vain and useless.
Evidence is the means by which a trier of fact learns the truth of the matters submitted to it for decision. Whether judge or jury, the trier of fact's ability to accomplish its goals of fairness and truth depends on the quality of the evidence put before it. The process itself is fair and the result presumably just where the parties have open opportunity to plead, discover, present and impeach evidence and argue their respective theories of the case. Where material evidence has been lost, the veracity and justice of the ultimate decision will of necessity suffer. Where that evidence has been wrongfully and intentionally destroyed, the injury is not only to the prejudiced party but also to the justice system itself and to the public's confidence in that system.
Of course, there will be circumstances that will deny the citizen material evidence, through the fault of no one. The passage of time, death of witnesses, deterioration of materials and memory, the party's own inaction and the ravages of nature all may contribute to such loss, and the legal system can provide no remedy. However, where the act of man results in the loss of the citizen's only means of proof, the civilian tradition is able to fashion an appropriate means of redress.
"The principle is, that a pleader always has the right to prove that which he alleges in his favor, judicial acts or facts pure and simple.
"... [Plaintiff] will demand from his adversary the production of the titles on which he counts for establishing his claim. It has been proposed to give to this action the name of the action ad exhibendum. It is not to be confused with the discovery of documents which takes place during a case in which issue has been joined.... It may have as its object not alone the production *1363 of titles, but also the production of an object whose examination is useful for the solution of a litigation.
"The writer derives the obligation of the custodian of the object from the plaintiff's right to prove. In contract cases, this obligation grows out of the reciprocal contractual obligations of the parties to act in good faith. The German Code (Art. 809) and the Swiss Code of Obligations (Art. 879) regulate the action ad exhibendum. The Franco-Italian project for Obligations (Art. 86) has a section concerning the obligation of producing a thing "if its examination is necessary to determine the existence or the limitations of the alleged right." Planiol, Civil Law Treatise, Vol. 2, No. 43.
The civilian "right to prove" provides the foundation, then, not only for discovery conducted in the course of litigation, but also for production of the thing, in this case the manhole cover, whose timely examination by metallurgists on behalf of both plaintiff and defendant could determine the existence as well as the limitations of plaintiff's underlying cause of action for damage to his property and person.[7]
In determining whether to apply the adverse inference, as well as in defining its scope and effect in a civilian context, we are guided toward the goals of a fair judicial process, the likelihood that the final verdict will be based on truth, and the need to deter wrongful, intentional spoliation of evidence in the future.
This civilian doctrine of the right to prove is perfectly consistent with these goals and with evidentiary rules providing for the adverse inference and shifting burden of proof that would place the onus of going forward with the evidence on a party through whose fault the only evidence of a material fact was destroyed.
Louisiana courts have recognized that where a litigant fails to produce evidence available to him, the presumption is that the evidence would have been unfavorable to him. Boh Brothers Construction v. Luber-Finer, Inc., 612 So.2d 270 (La.App. 4th Cir. 1992), writ denied 614 So.2d 1256 (La.1993); Wilson v. U.S. Fire and Casualty Company, 593 So.2d 695 (La.App. 4th Cir.1991), writ denied 597 So.2d 1027 and writ denied 597 So.2d 1037.
In a case arising out of an automobile accident, disposal of plaintiff's car while within plaintiff's possession was held to justify a jury charge granting a presumption that, had the car been introduced as evidence, it would have been unfavorable to plaintiff's case. McElroy v. Allstate Ins. Co., 420 So.2d 214, 215 (La.App. 4th Cir.1982), writ denied, 422 So.2d 165 (La.1982).
In McElroy, Judge Byrnes, speaking for this Court, held that the explanation offered by plaintiff, that the presence of the car upset her each time she saw it, was properly placed before the jury together with the adverse inference. Planiol would support the conclusion that the defendant's right to prove his defense was prejudiced by plaintiff's destruction of material evidence. The fairness of the process was vitiated by the unavailability of probative evidence. The trier of fact was denied information that could lead it to a true verdict. Significantly, absent the presumption, there would be no loss to the destroying party, and a message would go out to the community that evidence germane to issues in the judicial process may be destroyed at will without negative consequence. Such a message would adversely affect future proceedings, as well as limiting the effectiveness of the trier of fact in that particular case in reaching a fair verdict.[8]
*1364 Given these goals, the effect of spoliation will be determined properly in the context of each case by reference to its particular facts. By balancing the interests of the destroying party in disposing of its property against the interest of the prejudiced party to be able to prove his claim and the interest of the community as well as the parties in the fair process of litigation toward a true and just verdict, the appropriate effect of spoliation can be fixed in the particular case. In this way, the property interest of a third party, who destroys his property while unaware of its potential materiality might outweigh the interest of a party in establishing his case. The facts of each case will determine the proper balance.

APPLICATION OF PRINCIPLES TO THIS CASE
The trier of fact is unable to determine the absolute truth concerning the condition of the manhole cover at the time of the accident. Our function then is to look to the remaining goals and determine how to maximize each of them, in the manner in which the respective interests of plaintiff and defendant were balanced in the foregoing discussion of the evidentiary question.
Clearly, in the case at bar, there is a strong set of facts indicating that the balance of interests with respect to the issue of the existence of a defect favored the plaintiff at the time of the accident.
The civilian analyst must ask whether it is more or less likely that the SWB's action in destroying the evidence proceeded from a consciousness of guilt. Further, will the fairness of not only this judicial proceeding but also of others in the future be affected adversely if the SWB is able to defeat plaintiff's claim by virtue of having destroyed the manhole cover? Could Kammerer himself have prevented the loss of evidence?
SWB contends the destruction of the manhole cover was consistent with its policy of destroying all broken covers when they are replaced. This policy, rather than a consciousness of guilt, led to the destruction of the potential evidence.
An exhaustive study of the state of legal control of spoliation offers guidelines useful in examining this defense:
"A court facing charges that a litigant has destroyed evidence pursuant to a routinized program should make two inquiries. First, is the program designed or is it maintained to target for destruction documents which are routinely relevant to ongoing or clearly foreseeable litigation, such as safety and testing reports; and second, was the program operated so as to destroy evidence relevant to the instant litigation while it was pending, imminent or clearly foreseeable.?" Solum, L.B. and Marzen, S.J., Truth and Uncertainty: Legal Control of the Destruction of Evidence, 36 Emory L.J. 1085 (1987).
Courts have allowed this defense, relying on the spoliator's lack of fraudulent intent. A standard policy whose effect is the destruction of evidence has been held to defeat the presumption or adverse inference where the destroying party can show the destruction occurred as a matter of routine, but only under certain prescribed circumstances.
"Such a presumption or inference arises, however, only where the spoliation or destruction was intentional and indicates fraud and a desire to suppress the truth, and does not arise where the destruction was a matter of routine with no fraudulent intent." 29 Am Jur 2d § 177, at p. 221.
In Berthold-Jennings, supra, defendant destroyed waybills containing information necessary to maintenance of plaintiff's claims. The adverse inference was not allowed because all the information contained in the destroyed evidence was also available in receipted bills the defendant had given to the plaintiffs. The plaintiffs were unable to show that any information contained in destroyed documents was not otherwise available to them.
In U.S. v. Coplon, 185 F.2d 629 (2d Cir. 1950), certiorari denied 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688 (1952), as in the waybill case, the information contained in the destroyed evidence was otherwise available to the parties. The New York agents in charge of a wiretap investigation routinely destroyed disks and resumes of the wiretap after having *1365 sent resumes of the contents by letter to their Washington office. The original material was held for a fixed period and then routinely was destroyed, but the letters were preserved and produced at the trial. Judge Learned Hand, speaking for the court, found the adverse inference to be unjustified under these facts. Not only was there no fraudulent intent evident in the destruction of the original disks and resumes, but the information contained therein was available to the criminal defendant.
The rationale in the routine destruction cases was NOT merely that the destruction was routine, and without fraudulent intent, but that the information contained in the destroyed evidence was available through alternative evidence discoverable to the plaintiff. A requirement of fraud or bad faith to defeat the inference reflects an overly selective view of the common law cases; while a few scattered cases use the bad faith language, "a simple intentionality requirement is a more likely candidate for the `prevailing rule.'[9]
The SWB's "routine policy" had the effect in this case of destroying tangible evidence upon which plaintiff, by timely discovery, could have attempted to prove his claim that the manhole cover was defective; however, the policy did not preclude plaintiff from proving the City's actual or constructive knowledge of that alleged defect. By applying the civilian concept of "right to prove," the SWB's routine destruction of the cover did not eliminate Kammerer's sole avenue to prove his case. Plaintiff did not file suit or otherwise formally notify SWB of his claim until eleven months had passed. By that time, according to plaintiff's expert, the cover HAD IT NOT BEEN DESTROYED would not have enabled plaintiff to prove the pre-existence of a defect in the cover OR actual/constructive notice of the alleged defect by the SWB or the City of New Orleans. This educated plaintiff did not ask the SWB crew to preserve the cover, nor did he seek a protective order for its conservation. There has been no showing that the SWB employee, in whose 16 year experience no cover has been the subject of a lawsuit, was in any better position than Kammerer, an architect and contractor, to recognize the potential significance of the manhole cover and to require its preservation.
Further, the SWB policy did not preclude Kammerer from proving actual/constructive knowledge of the alleged defect by alternative means such as discovery of SWB and City records of complaints, and neighborhood interviews.
In this case, at the time of the accident, Kammerer had the opportunity to request that the cover be preserved. He knew at least as well as the SWB representatives that there was a likelihood of litigation arising out of the accident, and was at least as aware as the SWB employees at the scene of the significance of the manhole cover to that litigation.
The adverse inference arising from spoliation of evidence is, by its nature both compensatory and punitive.
"[T]he spoliator may have destroyed the only evidence available and may therefore have destroyed a plaintiff's cause of action. The compensatory and punitive functions of spoliation doctrine would both seem to be well served in such situations by allowing the spoliation inference to serve as substantive affirmative evidence."[10] (Emphasis added).
The inference is punitive in order to deter future destruction of evidence. The spoliation doctrine will foster the goal of deterrence only if the defendant suffers an adverse consequence as a result of his wilful destruction of the only available evidence of defect. Under the facts of this case, the plaintiff is himself responsible at least in part for the unavailability of the manhole cover. In addition, and significantly, he is also responsible through his own inaction for his failure to prove actual or constructive knowledge of the alleged defect. Under these *1366 circumstances, the punitive adverse inference is not justified.
The destruction of the manhole cover is, under the facts of this case, irrelevant to the ultimate resolution of the issue of SWB's liability, and has not eliminated Kammerer's "right to prove" his case. Under these circumstances, the adverse inference is not available. While the cover itself could have provided evidence of the time it became defective, thus determining whether a defect pre-existed the contact with Kammerer's truck and whether the defect's age at the time of the accident implied constructive knowledge on the part of SWB, this probative value was gone by the time Kammerer filed suit. Since constructive knowledge on the part of the SWB could have been proved with other evidence available to Kammerer, the adverse inference is unavailable as to that issue.

SEWERAGE AND WATER BOARD LIABILITY
Strict liability of a public entity such as the SWB is controlled by LSA-R.S. 9:2800, which provides in pertinent part:
"... No person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so."
In the instant case, the record is devoid of any evidence showing that the Sewerage and Water Board had notice, actual or constructive, of a defect in the manhole or cover in question. Both Kammerer and Ms. Giron testified that they travelled the Gentilly route often and had not observed the manhole cover out of place prior to the accident. Further, plaintiff's expert testified that it was unlikely for a manhole cover "in a heavy intersection" to be "off ... without someone reporting it."
Since the plaintiff failed to prove that the cover was defective or that the SWB had actual or constructive notice of a defect, the trial court's action granting defendant's motion at the close of plaintiff's evidence at trial for dismissal of plaintiff's petition was not manifestly erroneous. See, Rosell v. ESCO, 549 So.2d 840 (La.1989); Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993).
PLOTKIN, Judge, dissents with written reasons:
I dissent because the majority opinion, and especially the concurring opinion, distort and misinterpret the theory of "spoliation of evidence." Spoliation of evidence refers to the loss, destruction, or material alteration of evidence relevant to a lawsuit, whether the destruction is intentional or negligent. Traditionally, an adverse presumption that the evidence would have been adverse to the party who destroyed it is applied in spoliation of evidence cases. See Boh Brothers Construction Co. v. Luber-Finer, Inc., 612 So.2d 270, 274 (La.App. 4th Cir.1992).
In the instant case, the plaintiff sustained personal injuries when his vehicle struck an upright manhole cover in the center lane of Gentilly Boulevard; the plaintiff could not avoid striking the manhole cover under the circumstances surrounding the accident. The defendant, Sewerage and Water Board (S & WB), arrived on the scene within 20 minutes of the accident. The supervisor of the S & WB crew which appeared at the scene of the accident noted in his report that the incident had "legal" implications. Nevertheless, the S & WB workers destroyed the manhole cover, which was already broken into two pieces, by breaking it into even smaller pieces and placing it on a scrap metal heap. These actions were taken despite the fact that the S & WB is a professional defendant, which is well aware of the litigation risks and costs arising from its duties and responsibilities.
However, the trial court, the majority opinion, and the concurring opinion all agree that the plaintiff's suit should be involuntarily dismissed because the plaintiff failed to carry his burden of proving that the accident was caused by a defect in the manhole cover. The plaintiff claims that the trial court judgment *1367 is improper because the spoliation of evidence doctrine should have been applied to shift the burden of proof to the defendant. The majority summarily rejects this argument, saying the doctrine applies only when the evidence has been intentionally destroyed for the purpose of depriving the plaintiff of the use of the evidence, citing Williams v. General Motors Corp., 607 So.2d 695, 698-99 (La.App. 4th Cir.1992). However, the Williams case does not say that the spoliation doctrine applies only when the destruction was intentional and designed to deprive the plaintiff of the use of the evidence; that language comes from the concurring opinion. The Williams opinion imposes no such rule.
The concurring opinion's reasons for affirming the trial court judgment are even less concrete since they are based on an esoteric discussion of competing interests involved in situations where the destruction of the evidence is routine, as opposed to situations where the destruction of the evidence is intentional. The concurring opinion attempts to formulate a "Louisiana remedy" in situations involving spoliation of evidence by consideration of general civilian principles as they might be applied to a common law theory. The concurrence contains an extensive, confusing discussion of Constitutional principles, as well as legal commentary, which ultimately leads to the conclusion that the plaintiff has some type of "right to prove" his case. The doctrine of spoliation of the evidence should therefore be applied on a case-by-case basis, the concurring judge concludes, based on whether the plaintiff's "right to prove" has been denied. The concurrence suggests that we attempt to "balance interests" when deciding whether or not to apply the doctrine. In "balancing interests" in the instant case, the concurrence concludes that the trial court judgment was correct.
I suggest that a more straight-forward approach is required, and that such an approach has previously been adopted by this court in Boh Brothers Construction Co., 612 So.2d at 274, which is ignored by both the majority and the concurring opinions. In that opinion, the doctrine is explained as follows:
Where a litigant fails to produce evidence available to him and gives no reasonable explanation, the presumption is that evidence would have been unfavorable to his cause. The presumption is not applicable where the failure to produce the evidence is explained.
Id. Although the Boh Brothers Construction Co. case does not refer specifically to "spoliation of the evidence," which is technically a common law term, the above principles obviously apply to situations like that presented by the facts of the instant case since the S & WB failed to produce evidence which was in its custody. Even the concern expressed by the majority and concurring opinions in this casethat the evidence was destroyed merely as a part of the routine operations of the S & WBis covered by the above rule; obviously, routine destruction of evidence could be a "reasonable explanation" for a failure to produce evidence in certain cases. However, I do not believe that this is one of those cases, as explained in more detail below.
The plaintiff's argument that the doctrine should apply in this case is based on the fact that the defendant's intentional destruction of the evidence deprived him of the opportunity to have the manhole cover examined by an expert. In support of this argument, the plaintiff presented expert testimony indicating that an examination of the manhole cover could have revealed, in all probability, whether a defect existed at the time of the accident, as well as the length of time the defect had been present. Therefore, the defendant's spoliation of the manhole cover significantly impaired the plaintiff's ability to prosecute his claim in two major respects. Not only was he deprived of the opportunity to prove that the manhole cover was defective, which would subject the defendant to liability under La.C.C. art. 2317, but he was also deprived of the opportunity to prove that the defendant had constructive notice of the defect as required by LSA-R.S. 9:2800. The majority and the concurring opinions both ignore the latter fact, implying that examination of the manhole cover would have been insufficient to prove plaintiff's case because he failed to prove actual or constructive notice. This conclusion disregards the obvious since examination of the manhole cover itself *1368 was one effective way to prove constructive notice.
I would expressly expand the principles enunciated in the Boh Brothers Construction Co. case to cover spoliation of evidence and impose a general adverse presumption in cases involving the knowing destruction of evidence under circumstances, such as those presented by this case, where the party which destroys the evidence knew or should have known of the relevance of that evidence to potential litigation. Further, I would not condone an exception to this rule based purely on the fact that similar evidence is routinely destroyed. Such a rule provides a disincentive to the defendant to preserve important evidence and therefore should not be sanctioned because it is against public policy. Any general rule which sanctions the destruction of evidence when there exists a likelihood or potential for litigation, such as the one advanced by the majority and concurring opinions in this case, is deleterious to the goal of providing an "even playing field" for civil litigants.
Rather, the custodian of any type of evidence which is obviously or potentially relevant to a pending or possible litigation should be burdened with the responsibility of preserving that evidence. Any other rule allows the custodian to impose a significant handicapor, in some circumstances, an impossible burdenon an adverse party in litigation to prosecute or defend his lawsuit. The damage caused by such spoliation of evidence is always prejudicial to the adverse party.
Applying the Boh Brothers Construction Co. rule to the instant case, I would find that the adverse presumption against the S & WB was not rebutted because the explanation given for the destruction of the evidence was spurious. The decision to immediately destroy, as a matter of routine S & WB policy and procedure, every manhole cover that is defective, even if that manhole cover is potentially relevant to a civil action, is contrary to sound public policy. This type of routine action effectively prevents every injured party from meeting his burden of proof, thereby denying litigants justice.
Therefore, when the S & WB spoliated the evidence, a presumption that the evidence would have been adverse to the position of the S & WB should have arisen. This is especially true in light of the fact that the uncontradicted evidence presented in this case proved that the manhole cover was standing up in the manholea situation which would have been impossible in the absence of a defect. That presumption was not properly rebutted in this case, despite the "explanation" of the routine policy of the defendant. The defendant knew or should have known that the logical result of an accident involving personal injuries would be the filing of a civil lawsuit by the injured party. Further, the defendant knew or should have known that the manhole cover was crucial to the plaintiff's claim. Finally, the defendant acknowledges in its initial accident report that the accident had legal ramifications; thus, the defendant knew or should have known that the possible defective condition of the cover would be an issue at trial. Therefore, the manhole cover should have been preserved, not destroyed, as a matter of routine.
Further, as noted above, the conclusion espoused by both the majority and concurring opinion that the plaintiff could not have proven his case even if the manhole cover had been preserved, because the plaintiff failed to prove actual or constructive notice, is also disingenuous. First, the plaintiff was deprived of the opportunity to prove constructive notice by the very fact that the defendant destroyed the evidence, as explained above. Second, the majority and concurring opinions speculate and penalize the plaintiff for failing to try to prove constructive notice through traditional means by conducting an independent investigation of the defendant's records or canvasing the accident area for potential witnesses who might have provided evidence of constructive notice.
Every litigant has a choice of strategy to employ when trying to meet his burden of proof. Trial techniques available to the artful attorney are limitless. Litigants should therefore be allowed to employ the trial techniques they chose without penalty, provided the action is prosecuted within proper legal and ethical limits. In this case, the plaintiff *1369 elected to pursue his case under the provisions of La.C.C. art. 2317 and LSA-R.S. 9:2800. To justify the absence of proof of notice to the defendant, the plaintiff chose to rely on the manhole cover, not to subpoena the defendant's records or to canvas the accident site. The majority and concurring judges' decision to penalize the plaintiff in order to palliate the spoliation issue is unfounded and improper.
The effect of the majority and concurring opinions is to place an impossible burden of proof on the plaintiff in this case. The decision will provide every defendant in every product liability case with an incentive to routinely spoliate crucial evidence without fear of penalty. Further, the decision forces all plaintiffs to prove their cases through the records of the defendant and by other traditional methods. This restructured approach almost insures that the defendant will prevail in these cases, unless an anti-spoliation trend is instituted.
For these reasons, I respectfully dissent and would vacate the judgment and remand the case for retrial, consistent with the principles expressed herein.
NOTES
[1] "By resorting to wrongful devices, the party is said to provide a basis for believing that he or she thinks the case is weak and not to be won by fair means.... Accordingly, the following are considered under this general category of admissions by conduct: ... destruction ... of relevant... objects." McCormick on Evidence, 4th edition, § 265 at pp. 190-191. West Publishing Company, 1992. (Emphasis added).

"It is a general rule that the intentional spoliation or destruction of evidence relevant to a case raises a presumption, or more properly, an inference, that this evidence would have been unfavorable to the cause of the spoliator." 29 AmJur 2d § 177, at pp. 220-221.
[2] "What is the value of these various kinds of spoliation' admissions, beyond their great tactical value in darkening the atmosphere of the party's case? They should entitle the proponent at least to an instruction that the adversary's conduct may be considered generally as tending to corroborate the proponent's case and to discredit that of the adversary.... However, a crucial and perplexing question remains, namely, does the adverse inference from the party's obstructive conduct substitute for evidence of a fact essential to the adversary's case? Certainly the primitive impulse to answer `yes' is strong, and an analogy has been suggested to the practice under statutes and rules permitting the court to enter a default against a party who refuses to provide discovery [citing Fed.R.Civ.P. 37(b)(2)]. Certainly, when the conduct points toward an inference about a specific fact, as in the case of bribing an attesting witness to be absent or destroying a particular document, there is likely to be a greater willingness to allow an inference of that fact although the only available information regarding it is the proponent's claim in the pleadings." McCormick, supra at p. 192.
[3] "[M]any decisions have supported the general doctrine that the inference from obstructive conduct will not satisfy the need for proof of a particular fact essential to the proponent's case. (Citing Stanojev, supra, and cases from Maryland, Massachusetts, New Hampshire, Vermont and Washington State.)" McCormick, Id. at p. 193.

"While the spoliation of evidence may raise a presumption or inference against the party guilty of such act, it does not relieve the other party from introducing evidence tending affirmatively to prove his case, insofar as he has the burden of proof. This presumption or inference does not amount to substantive proof and cannot take the place of substantive proof and cannot take the place of proof of a fact necessary to the other party's cause. (Citing cases from California, Michigan, Vermont and Maryland)." 29 Am. Jur.2d § 177 at p. 221.
[4] "Some recent cases have indicated a willingness to rethink these traditionally established principles. Several cases have found intentional actions that result in the destruction of evidence either to shift the burden of proof or to provide affirmative evidence on a critical issue." McCormick, Id. at p. 193.

In Nation-Wide Check Corp. v. Forest Hills Distributors, Inc., 692 F.2d 214, 217-219 (1st Cir.1982), the court held that the destruction of documents amounting to "knowing disregard" for plaintiff's claim, although not necessarily constituting "bad faith", gave rise to an adverse inference that sustained plaintiff's burden of proof.
Welsh v. U.S., 844 F.2d 1239, 1245-1249 (6th Cir.1988) reaches a similar result. The court allowed the creation of a rebuttable presumption sufficient to survive a directed verdict from the negligent loss or destruction of evidence by an adverse party. (Contra: Stanojev, supra, and Comment in 19 Memphis State Law Review 229 (1989) questioning the Welsh result.)
In Public Health Trust v. Valcin, 507 So.2d 596 (Fla.1987), Florida recognized that the rebuttable presumption arising from negligent destruction of evidence shifts the burden of proof to the adverse party.
[5] For an excellent summary of this controversy, see, Solum, L.B., and Marzen, S.J., Truth and Uncertainty: Legal Control of Destruction of Evidence, 36 Emory L.J. 1085 (1987); Lionberger, P.A., Comment, 21 St. Mary's L.J. 209 (1989). Exemplary cases discussing the social utility and problematic nature of the tort include Smith v. Superior Court, 151 Cal.App.3d 491, 198 Cal. Rptr. 829 (1984); Koplin v. Rosel Well Perforators, Inc., 241 Kan. 206, 734 P.2d 1177 (1987); Hazen v. Municipality of Anchorage, 718 P.2d 456 (Alaska 1986); and Parker v. Thyssen Min. Const., Inc., 428 So.2d 615 (Ala.1983).
[6] Herman, S., The Louisiana Civil Code: A European Legacy for the United States, pages 50-52. Louisiana Bar Foundation, 1993.
[7] Planiol admits of only two causes for suppression of this right to prove, the now archaic defense of "scandal harmful to public morality" (which had prevented prosecutions for incest and truth defenses in defamation cases arising out of the private lives of defamed persons) and where the means of proof are of a vague nature, witnesses have been suborned or writings subject to production have been falsified. Planiol, Civil Law Treatise, Vol. 2, No. 44.
[8] The inference is not available, however, where a litigant provides a reasonable explanation for his failure to produce evidence in court. See, Judge Byrnes' opinion in Williams v. General Motors Corporation, 93-CA-0287, 11 February 1994, ___ So.2d ___ (La.App. 4th Cir.1994); Bourgeois v. Bill Watson's Investments, Inc., 458 So.2d 167 (La.App. 5th Cir.1984); Babineaux v. Black, 396 So.2d 584 (La.App. 3rd Cir.1981).
[9] Solum, L.B., and Marzen, S.J., Truth and Uncertainty: Legal Control of the Destruction of Evidence, 36 Emory L.J. 1085 (1987).
[10] Solum, L.B., and Marzen, S.J., Truth and Uncertainty: Legal Control of the Destruction of Evidence, 36 Emory L.J. 1085 (1987).